**In the Matter of Lorenzo BISHOP, Jr., Debtor.**

**Lorenzo Bishop, Plaintiff,**

**v.**

**U.S. Bank/Firstar Bank, N.A., Defendant.**

**Bankruptcy No. 02–40352.
Adversary No. 02–4130.**

United States Bankruptcy Court,
S.D. Georgia,
Savannah Division.

May 2, 2003.

Jeff Hanna, Savannah, GA, for Plaintiff/Movant.

J. Keith Berry, Jr., Savannah, GA, for Defendant/Respondent.

### MEMORANDUM AND ORDER

LAMAR W. DAVIS, Jr., Bankruptcy Judge.

Lorenzo Bishop, Jr. ("Debtor") filed for Chapter 13 bankruptcy protection on January 31, 2002. Debtor listed Firstar Bank as a secured creditor holding two claims, one of which was secured by a 2000 Pontiac Grand Prix and the other by a 1998 Ford F–150 truck ("the truck"). A proof of claim regarding the truck was filed by "U.S. Bank, a/k/a Firstar Bank" (hereinafter "Bank"), and Debtor surrendered the Grand Prix to Bank. On June 11, 2002, this Court confirmed Debtor's Modified Plan of Reorganization, which provided for payment in full of Bank's secured claim.

On September 30, 2002, Debtor filed an adversary complaint asserting that Bank had willfully violated the automatic stay of 11 U.S.C. § 362(a) by taking several actions which culminated in repossession of

the truck. Bank was timely served, but filed no response. On November 25, 2002, the Clerk entered a default against Bank as authorized by Bankruptcy Rule 7055, and a trial date was set for a hearing to determine damages.

The hearing on damages was held on January 23, 2002. Bank received timely notice, but did not appear at the hearing. After hearing Debtor's testimony and oral argument of Debtor's counsel, I instructed the Chapter 13 Trustee to cease making disbursements under Debtor's plan to Bank and took the matter of damages under advisement. On April 4, 2003, Bank filed a request for an additional hearing on damages.

This Court has jurisdiction in this core bankruptcy proceeding under 28 U.S.C. §§ 1334(e) and 157(b) and the general order of reference of the District Court for the Southern District of Georgia. Having considered the evidence and applicable authority, I make the following Findings of Fact and Conclusions of Law in compliance with the directives of Bankruptcy Rule 7052.

## FINDINGS OF FACT

On or about the evening of September 18, 2002, approximately three months after Debtor's Chapter 13 plan was confirmed, an individual acting under Bank's authority ("the repo agent") went to the home of Debtor's mother for the purpose of repossessing Debtor's truck. The repo agent informed her that Debtor had filed bankruptcy, and he refused to leave unless and until she provided Debtor's address. Debtor's mother, who had been unaware that Debtor was in bankruptcy, but who had experienced an earlier wrongful repos-session attempt by Bank, became upset and telephoned Debtor.[1]

Debtor spoke to the repo agent, first by telephone and then in person. Debtor reminded the agent that Debtor was in bankruptcy, and informed the agent that Debtor was making payments according to his bankruptcy plan. Debtor and his wife then drove to meet the repo agent, talked with him, and showed him the bankruptcy paperwork. When Debtor returned home, the repo agent called Debtor and told him that the agent still intended to repossess the truck. Debtor went to the police station to show the agent proof that he was making payments under the bankruptcy plan. Debtor told the repo agent he was keeping the truck and that he needed to consult his bankruptcy counsel. Debtor then returned home.

After Debtor returned home, a law enforcement officer telephoned Debtor and told him that he would be arrested if he did not surrender the truck. Believing that his arrest was imminent, Debtor returned to the police station and gave the repo agent the key. The repo agent took possession of the truck. On the following day, after Debtor met with his attorney and his attorney made numerous demands upon the Bank, the truck was returned to Debtor.

As a result of the repossession, Debtor was unable to work for one day and lost $90.00 in wages and $53.00 in traveling expenses, first in attempting to keep his truck and then in effecting its return. In prosecuting this proceeding, he lost more time at work which amounted to $135.00 in lost wages. Debtor's out-of-pocket expenses totaled $ 278.00. Ex. A.

---

1. On an earlier occasion, after Debtor had surrendered the Grand Prix to Bank in accordance with his bankruptcy plan, Bank had also attempted, wrongfully, to "repossess" that vehicle at Debtor's mother's house.

Debtor also incurred legal expenses resulting from the repossession. His bankruptcy attorney took numerous actions on his behalf to effect the return of the truck and to compensate and protect him by prosecuting this adversary proceeding. Those expenses, which totaled $1,028.84, see Ex. B (itemizing costs and 6.8 attorney hours at $150.00 per hour) are reasonable.

Bank had notice of the bankruptcy case, the adversary proceeding, and all scheduled hearings. Bank filed no answer and elected not to appear at the hearing on damages. Bank's sole response—a request for a second hearing on damages—was filed more than two months after the hearing. At the time Bank repossessed the truck, Debtor was current in making payments under the Plan, and he has continued to make timely payments.

## CONCLUSIONS OF LAW

■ A petition for bankruptcy relief operates automatically upon filing as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate . . . until such property is no longer property of the estate." 11 U.S.C. § 362(a)(3), (c)(1). As "one of the fundamental debtor protections provided by bankruptcy laws," *Midlantic Nat'l Bank v. New Jersey Dept. of Env. Protection,* 474 U.S. 494, 503, 106 S.Ct. 755, 760, 88 L.Ed.2d 859 (1986), the automatic stay is intended to stop virtually all debt collection efforts, including efforts to take possession of collateral, *e.g., Louisville & Jefferson County Metro. Sewer Dist. v. Excel Eng'g, Inc. (In re Excel Eng'g, Inc.),* 224 B.R. 582, 592 (Bankr.W.D.Ky.1998).

■ An act taken in willful violation of the stay subjects the actor to liability for "actual damages, including costs and attorneys' fees, and, in appropriate circumstances . . . punitive damages." 11 U.S.C. § 362(h). A stay violation is "willful" if a creditor has knowledge of the bankruptcy filing and deliberately acts in such a way that violates the stay. *E.g., Flynn v. IRS (In re Flynn),* 169 B.R. 1007, 1013–14 (Bankr.S.D.Ga.1994) (Davis, J.), *aff'd in part, rev'd in part,* 185 B.R. 89 (S.D.Ga. 1995); *see also, e.g., Goichman v. Bloom (In re Bloom),* 875 F.2d 224, 227 (9th Cir.1989) (noting that specific intent need not be shown); *In re Withrow,* 93 B.R. 436, 439 (Bankr.W.D.N.C.1988) (noting that defendant's election to operate through distant agents does not insulate defendant from willful stay violations).

In this case, Bank's liability in willfully violating the automatic stay has been established. Bank made no effort to refute credible evidence showing that Bank had knowledge of Debtor's bankruptcy, that Bank's agent harassed Debtor and his mother, that the agent repossessed the truck, and that the truck was not returned to Debtor until the day after the repossession, when Debtor's attorney became involved.

Only the issues regarding damages remain to be determined. Pursuant to the discussion below, I make the following conclusions with respect to the assessment of actual and punitive damages against Bank.

### A. Actual Damages

Section 362(h) provides that an individual debtor injured by a willful violation of the stay "*shall* recover actual damages, including costs and attorney's fees." 11 U.S.C. § 362(h) (emphasis added). In this case, Debtor suffered actual damages in the forms of out-of-pocket expenses, attorney's fees, and emotional distress.

### 1. Out-of-pocket expenses and attorney fees

■ As a result of the repo agent's violation of the stay, Debtor incurred reason-

able out-of-pocket expenses and attorney fees in the total amount of $1,306.84. That amount is compensable as actual damages pursuant to § 362(h).

## 2. Emotional distress

■ Section 362(h) is a remedial provision within the Bankruptcy Code by which a debtor's rights under the stay are vindicated. *Flynn*, 169 B.R. at 1022; *see also Spires v. Collections, Ltd. (In re Spires)*, 1991 WL 11002464, *2 (Bankr. S.D.Ga.1991) (Dalis, J.) (noting debtors' reasonable expectation that seeking bankruptcy relief ensures cessation of collection efforts against them). "Actual damages" for which recovery is mandated under § 362(h) include damages for emotional distress. *E.g., Fleet Mortgage Group, Inc. v. Kaneb*, 196 F.3d 265, 269 (1st Cir.1999).

■ A bankruptcy court may award damages attributed to emotional distress if a preponderance of the evidence shows that emotional harm occurred and that the defendant's conduct in willfully violating the stay was the cause of that harm. *See, e.g., In re Steenstra*, 280 B.R. 560, 569 (Bankr.D.Mass.2002) (noting preponderance standard); *Clayton v. King (In re Clayton)*, 235 B.R. 801, 810–11 (Bankr. M.D.N.C.1998) (noting that debtor bears burden to show damages suffered as proximate result of defendant's actions).

■ An award of damages for emotional distress due to a violation of the stay is appropriate where a natural and powerful emotional distress is readily apparent from the nature or extent of the wrongful conduct under the particular circumstances surrounding the stay violation.[2] *Compare Kaneb*, 196 F.3d at 270 (noting changes in debtor's eating and sleeping habits, lack of enthusiasm for social situations, concern about where he will live and concluding that "[a]n honest accounting of actual damages under § 362(h) must include the psychological suffering of this eighty-five year old retired widower"); *United States v. Flynn (In re Flynn)*, 185 B.R. 89, 93 (S.D.Ga.1995) (Nangle, J.) (noting "clear" emotional distress, in that debtor's checking account was frozen for seven days, she was forced to cancel son's birthday party, and her check for groceries was refused) (affirming emotional distress award in *Flynn*, 169 B.R. at 1022–23 (noting that debtor's "natural and powerful emotion reactions cannot be dismissed as 'fleeting' or inconsequential'" when it is "otherwise clear that the debtor suffered some appreciable emotional harm"))[3]; *In re Brigham*, 2001 WL 1868123, *2 (Bankr. D.N.H.2001) (awarding emotional distress damages where hospital wrongfully sent statements and collection notice to debtor suffering from chronic lung disease and debtor suffered difficulty in breathing due to resulting increased stress); *Covington v. IRS (In re Covington)*, 256 B.R. 463, 467 (Bankr.D.S.C.2000) (finding emotional distress due to anguish regarding impact of notice of IRS intent to levy because debt-

**2.** Medical testimony, while helpful, is not required for sufficiency of proof of emotional harm in a § 362(h) inquiry. *See Flynn*, 185 B.R. at 92–93 (affirming this Court's emotional distress award in *Flynn*, 169 B.R. 1007 (Bankr.S.D.Ga.1994)).

**3.** The debtor in *Flynn*, who was struggling under the weight of huge tax obligations resulting from her ex-husband's actions, filed bankruptcy because she was assured that filing would stay creditor actions against her.

Instead, she was subjected to a wrongful levy by the IRS. As a result of that levy, her bank account was frozen, several checks bounced, a store refused her check in front of other customers, and she was forced to cancel her son's birthday party. I awarded damages for emotional distress justified by the great consternation and embarrassment she inevitably suffered as a consequence of that levy. *See Flynn*, 169 B.R. at 1010–11.

ors, who had endured previous levy by another government agency, understood effect of IRS levy); *Poole v. U.B. Vehicle Leasing, Inc. (In re Poole)*, 242 B.R. 104, 112 (Bankr.N.D.Ga.1999) (finding emotional distress where married debtors showed that husband was stigmatized at work and deprived of benefits of employment and that wrongful post discharge garnishment caused them to relive humiliation of bankruptcy and garnishment); *Fisher v. Blackstone Fin. Servs., Inc. (In re Fisher)*, 144 B.R. 237, 239–40 (Bankr.D.R.I.1992) (awarding damages for "embarrassment and emotional distress" caused by creditor's egregious conduct—accusing debtor of criminal conduct and repossessing vehicle at § 341 meeting under protest from debtor and her attorney); *In re Carrigan*, 109 B.R. 167, 168–72 (Bankr.W.D.N.C. 1989) (conclusively presuming emotional distress because "the outrageous nature of the creditor's conduct"-which included going to debtor's home, using loud and abusive language, refusing to leave, and making obscene gesture-"was sufficiently strong to produce the anxiety expressed by the debtor"), *with Aiello v. Providian Fin. Corp. (In re Aiello)*, 231 B.R. 684, 690 (Bankr.N.D.Ill.1999) (holding that sending one post petition letter attempting to coerce debtor into reaffirming debt "was not so extreme and outrageous that this court can presume that emotional distress would naturally follow"), *judgment aff'd*, 257 B.R. 245 (N.D.Ill.2000), *aff'd*, 239 F.3d 876 (7th Cir.2001); *Jennings v. R & R Cars & Trucks (In re Jennings)*, 2001 WL 1806980, *7 (Bankr.D.S.C.2001) (denying damages where debtors merely indicated they were upset).

Circumstances surrounding the violation can also show that no emotional distress occurred or that it was incompensable as merely "fleeting and inconsequential." In *Stewart v. United States (In re Stewart)*, 2000 WL 1194437 (Bankr.S.D.Ga.2000),

this Court found no compensable emotional distress where the debtor received an IRS computer-generated levy because the IRS had previously assured the debtor that it would take no collection action. *Id.* at *6 (finding that debtors "had no basis to specifically fear the collection"). Similarly, in *Washington v. IRS (In re Washington)*, 172 B.R. 415 (Bankr.S.D.Ga.1994), *aff'd in part, vacated in part*, 184 B.R. 172 (S.D.Ga.1995), this Court found that the debtor's embarrassment upon being informed of an IRS levy by her dispatcher at work was merely fleeting and inconsequential and caused no compensable harm. *Washington*, 172 B.R. at 427.

 In this case, the harm was readily apparent. Debtor testified, credibly. He was subjected to an intentional stay violation by the first contact with his mother and her telephone call to him. He retained his composure and advised the Bank's agent of his pending bankruptcy case. The agent persisted and wrongfully involved Debtor's wife, mother, and law enforcement agencies in his unlawful, repeated attempts to flout federal protections on which Debtor rightfully relied. There is no doubt that (1) Debtor suffered fear, anguish, and intense personal humiliation because of the interjection of these outside family members and police authorities into a matter they should never have been aware of, and that (2) Debtor suffered heightened distress over the threat of incarceration.

One Court has held that evidence of financial harm to be a prerequisite for a bankruptcy court's award of emotional distress. The Court of Appeals for the Seventh Circuit held in *Aiello v. Providian Financial Corp.*, 239 F.3d 876 (7th Cir. 2001), that a debtor may not be awarded damages for emotional injury asserted as actual damages under § 362(h) unless that

debtor also suffered an identifiable financial loss upon which to "piggyback" an emotional distress claim. *Id.* at 880. Opining that a debtor's protection under the automatic stay in bankruptcy is financial in character, rather than for the protection of the debtor's peace of mind, the *Aiello* court noted that victims of tortious infliction of emotional distress in the course of a bankruptcy proceeding are free to assert causes of action under state tort law, and stressed that "[t]he office of section 362(h) is not to redress tort violations but to protect the rights conferred by the automatic stay." *Id.* at 879. The court also explained, however, that "topping off" relief designed to redress financial injury inflicted upon a debtor by violation of the automatic stay is appropriate in some circumstances under the "cleanup doctrine," thus sparing a debtor from having to bring two law suits. *Id.* at 880–81.

I respectfully disagree with the Seventh Circuit's piggybacking requirement in *Aiello*. That court acknowledged that emotional distress damages are "actual damages," yet questioned whether an award for emotional distress is "authorized" by § 362(h).[4] *Aiello*, 239 F.3d at 878. In that § 362(h) provides that "[a]n individual injured by any willful violation ... *shall* recover actual damages," 11 U.S.C. § 362(h) (emphasis added), and that emotional distress damages are "actual damages," there appears to be no reason to question their statutory authorization. The hurdle for awarding emotional distress damages is not statutory authorization, but, rather, proof that the emotional distress in fact existed. Here, there was an actual monetary loss, so even under *Aiello*, the Court would be authorized to

piggyback damages for emotional distress in any event. However, I hold that emotional distress is an actual harm that qualifies for an award of actual damages under § 362(h) without regard to the existence of other damages. *See Kaneb*, 196 F.3d at 269. In conclusion, emotional distress was readily apparent and coupled with other monetary loss as well.

Where both emotional distress and willful conduct have been established, the causal link between the willful conduct in violation of the stay and the harm must be clearly established or readily apparent. *See Burke v. Georgia Dept. of Rev. (In re Burke)*, 285 B.R. 534, 536–37 (Bankr. S.D.Ga.2001) (Dalis, J.) (holding that debtors' failure to present credible evidence of alleged harm—inability to conceive and marriage breakup—with defendant's conduct precluded award of emotional distress damages).

Here, the casual connection between Defendant's acts and the distress experienced by Debtor is not speculative, but certain. The natural and direct connection between the agent's acts and Debtor's loss could not be more clear. Debtor asserted his rights for several hours. He did not take the truck with him the first time he went to the police station. He explained why the truck should not be repossessed. He stated that he needed to talk to his bankruptcy attorney. He returned home. After asserting his rights for several hours, trying to explain about his bankruptcy and his current good standing in making payments, and holding up in the face of his mother's and wife's concerns, Debtor's ultimate capitulation under the more serious threat of arrest and surrender and the

---

**4.** Noting that the First Circuit had held that damages awarded for emotional injury under § 362(h) are actual damages, the *Aiello* court commented: "No doubt they are; but wheth-er their award is authorized by the statute is a separate question ...." *Aiello,* 239 F.3d at 878.

distress it caused was the direct result of the wrongful acts of Defendant.

Furthermore, it is clear that mental distress was precisely the effect on Debtor that the repo agent intended. I find that each act was calculated by the repo agent to push Debtor into giving up his truck and that the totality of all the agent's actions and demands on Debtor culminated in inevitable emotional distress as evidenced by Debtor yielding after several hours of resistance. In light of the egregious conduct of the repo agent and Debtor's eventual capitulation, it is clear that Debtor's emotional distress was both readily apparent and directly caused by Defendant.

I conclude, therefore, that Debtor is entitled to actual damages for emotional distress in the amount of $5,000.00.

### B. Punitive Damages

██ Punitive damages are permitted for a willful violation of the automatic stay "in appropriate circumstances." 11 U.S.C. § 362(h). "Appropriate circumstances" include actions taken with malicious intent to harm and actions taken in arrogant defiance of federal law. *See, e.g., Crysen/Montenay Energy Co. v. Esselen Assocs., Inc. (In re Crysen/Montenay Energy Co.),* 902 F.2d 1098, 1105 (2d Cir.1990) (stating that finding of creditor's maliciousness or bad faith warrants punitive damages under § 362(h)); *In re Dunning,* 269 B.R. 357, 363 (Bankr.N.D.Ohio 2001) (noting line of cases concluding that punitive damages are appropriate where arrogant defiance of federal law is demonstrated).

██ The Bankruptcy Appellate Panel for the First Circuit identified the factors to be evaluated in determining whether and in what amount punitive damages are warranted under § 362(h): the degree of reprehensibility of the violator's conduct; the ratio between the compensatory and punitive damages; and the difference between the punitive damage award and the civil penalties authorized or imposed for comparable conduct. *Varela v. Ocasio (In re Ocasio),* 272 B.R. 815, 825 (1st Cir. BAP 2002) (applying guideposts set out in *BMW of N. Am. v. Gore,* 517 U.S. 559, 574–75, 116 S.Ct. 1589, 1598–99, 134 L.Ed.2d 809 (1996)). "[T]he primary purpose of punitive damages awarded for a willful violation of the automatic stay is to cause a change in the creditor's behavior . . . ." *Id.* (quoting *In re Shade,* 261 B.R. 213, 216 (Bankr.C.D.Ill.2001)); *see also, e.g., EEOC v. W & O, Inc.,* 213 F.3d 600, 614 (11th Cir.2000) ("[C]ourts should . . . consider whether the amount of punitive damages serves the interests of deterrence.") (addressing punitive damages in context of 42 U.S.C. § 1981 violation); *In re Dunning,* 269 B.R. at 365 ("This Court seeks to foster compliance with the Code and has no wish to continue to encounter the same financial institutions in the courtroom because of future violations of the Code.").

In this case, I find that appropriate circumstances exist for imposing punitive damages. First, Bank had wrongfully pursued this same debtor in another attempt related to Debtor's bankruptcy. In that situation, Bank's repo agents attempted to "repossess" a vehicle (that Debtor had already surrendered to Bank in accordance with the bankruptcy plan) by going to Debtor's mother house. Second, as discussed above, the repo agent's actions in the recent incident were malicious in their intent to produce anxiety in Debtor. Finally, Bank's repo agent's continued harassment of Debtor in the face of the actual knowledge of Debtor's bankruptcy clearly shows callous defiance of federal bankruptcy law.

Bank has allowed or instructed its repo agents to attempt to repossess a vehicle

that Debtor had already surrendered in accordance with the bankruptcy plan, to repossess a vehicle that Debtor was entitled to keep in accordance with the plan, and to engage in a full repertoire of scare tactics available outside of bankruptcy to effect that repossession. Bank's acts in manipulating Debtor by contact with his mother and the local police is reprehensible. Worse, Bank has made no effort to defend its actions, mitigate their effect, or show any degree of remorse. Bank's nonchalance about protections of debtors in bankruptcy and its contempt for this Court are apparent. This debtor has been a victim of Bank's wrongful repossession tactics on two occasions and a victim to particularly malicious conduct on the second occasion. Bank was thereafter served with a summons and complaint ordering it to respond to the charges. It defied that summons, ignored the lawful processes of this court and displayed a continuing complete utter disregard and defiance of federal law and the legal process.

Only now, on the eve of entry of this order, has Bank made an appearance, filing—incredibly—a request for an *expedited*, immediate, additional hearing on damages. A motion to reopen the record prior to the issuance of final judgment is addressed to the sound discretion of the trial court. *Lundgren v. McDaniel*, 814 F.2d 600, 607 (11th Cir.1987). Here, Bank does not dispute proper service, nor default as to both liability and damages. It states no basis other than "inadvertent mistake." The file reflects due and legal service of a summons and notice to a Rule 16 conference on November 20, 2002. Bank failed to appear for the conference. An entry of default was made on November 25, 2002, and served on Bank. No motion to set aside the default was made. Notice of Trial was served on the same date and still no motion to set aside, answer, or appear-

ance at trial occurred. Because Bank utterly failed to act timely and has articulated no compelling reason to reopen the evidence, I therefore exercise my discretion in denying that motion. In light of Bank's neglect of its opportunity to litigate the issue of damages, this motion is too little too late. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 332, 91 S.Ct. 795, 803, 28 L.Ed.2d 77 ("[W]e cannot say that the judge abused his discretion or stressed too much the value of avoiding reopening a trial to litigate matters that [the moving party] had an opportunity, but neglected, to litigate."). The trial took place more than two months ago, and on April 4, 2003, when Bank's first and only response was filed, the Court's opinion was in final draft form. Bank's relief, if any, may be sought by direct appeal or Rule 60.

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *BMW*, 517 U.S. at 575, 116 S.Ct. 1589. In this case, having considered Bank's agent's reprehensible conduct specifically targeted toward this debtor, including all the actions to repossess despite notice of Debtor's bankruptcy, and in particular, the failure to halt when shown proof of the bankruptcy and the actual escalation of the level of threat imposed upon Debtor, and its contemptuous conduct in this case, I find that an award of $50,000.00 in punitive damages is warranted.

### ORDER

Defendant U.S. Bank/Firstar is hereby ORDERED to pay to Plaintiff Lorenzo Bishop actual and punitive damages in the total amount of $56,306.84 which amount includes actual damages for out-of-pocket

expense, attorney's fees, and emotional distress in the amount of $6,306.84 and punitive damages of $50,000.00.

IT IS FURTHER ORDERED that the punitive damages be offset against the amounts due Bank under the confirmed plan of reorganization.